# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   Criminal No. 15-CR-10326-RGS |
| | ) |
| RUSSELL DINOVO, | ) |
|      Defendant. | ) |

## GOVERNMENT'S SENTENCING MEMORANDUM

## I.   BACKGROUND

On October 29, 2015, a one-count Indictment charging Russell Dinovo ("Dinovo" or "defendant'), with one count of one count of Armed Bank Robbery, in violation of 18 U.S.C. §§ 2113(a),(d) and § 2, was returned; as well as a Forfeiture Allegation pursuant to 18 U.S.C. §§ 981(a)(1)(C), 924(d) and 28 U.S.C. § 2461(c).   On December 11, 2017, Dinovo entered a guilty plea before this Honorable Court.[1]   In the afternoon hours of October 9, 2015, with their faces partly covered, Dinovo and another individual, later identified as Anthony Pantone, entered the Hingham Institute for Savings Bank on Charles Street in Boston, and, with Pantone holding an airsoft fake gun, the men robbed the bank of $16,320.95, and ordered the bank tellers to the ground, before fleeing.[2]

In the Presentence Report ("PSR"), U.S. Probation calculated Dinovo's total offense level as follows:   per U.S.S.G. §2B3.1(a), a base offense level ("BOL") of 20; per U.S.S.G. §2B3.1(b)(1), an additional 2 level increase because the property of a financial institute was taken; per U.S.S.G. §2B3.1(b)(2)(E), and an additional three level increase because a dangerous

---

[1]  The plea was tendered without a plea agreement.
[2]  Pantone was charged separately.   On August 1, 2016, he was sentenced to 78 months.   His GSR was 84-105 months.   *See United States v. Anthony Pantone*, (#16-CR-10018-IT).

1

weapon was brandished or possessed.   With a three level reduction for acceptance of

responsibility, pursuant to U.S.S.G. §3E1.1, Probation calculates Dinovo's total offense level

("TOL") to be 22.   *See* PSR ¶¶ 31-41.   Per the initial and final PSR, based upon a TOL of 22

and a CHC of III, U.S. Probation calculates the advisory guideline sentencing range to be 51-63

months.   *See* PSR ¶ 70, 71, 156.   The statutory maximum term of imprisonment is 25 years.

*See* PSR ¶ 155.

The government submitted objections to the PSR including objecting to U.S. Probation

applying the three level increase under U.S.S.G. §2B3.1(b)(2)(E), rather than a four level

increase under U.S.S.G. §2B3.1(b)(2)(D).   As it argued relative to co-defendant Pantone, the

government maintains the airsoft fake air-gun was "otherwise used" by co-defendant Pantone

rather than "brandished" or "possessed" by Pantone during the commission of the bank robbery.[3]

As such, as outlined in its objections to the PSR, the government asserts that a TOL of 23 and a

CHC of III would yield an advisory guidelines sentencing range of 57-71 months.

A guidelines sentence is warranted in this case.   There is no basis for a variance or

downward departure.   The government recommends a sentence of 57 months, followed by five

years of supervised release, a $100 special assessment, and forfeiture.   The government asserts

that this sentence is warranted for several reasons:   the nature and circumstances of this serious

offense; the defendant's history and characteristics, which include a criminal record dating back

to 1980 years consisting of multiple convictions for crimes of violence as well as two federal

convictions; the real danger posed to the community by individuals who rob banks with guns or

---

[3] The government's argument for a four level increase, pursuant to USSG §2B3.1(b)(2)(D), is included in a later section herein.   Additionally, at the sentencing hearing for Pantone, the Court declined to apply the four level increase, and instead, adopted the PSR calculations.

with what appear to be real guns, and the need to protect the public; and both specific and general deterrence.

## II.   PURSUANT TO U.S.S.G. § 2B3.1(b)(2)(D), A FOUR LEVEL INCREASE IN OFFENSE LEVEL IS WARRANTED

Pursuant to USSG § 2B3.1(b)(2)(D), the government argues that a four level increase to the TOL, rather than a three level increase under U.S.S.G. § 2B3.1(b)(2)(E), applies.   The evidence demonstrated the airsoft fake air-gun was "otherwise used," rather than "brandished" or "possessed" during the commission of the bank robbery.[4]

As outlined in its objections to the PSR, per U.S.S.G. § 1B1.1 Application Note 1(C), a dangerous weapon or firearm is "brandished" when all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person.   Accordingly, although the dangerous weapon does not have to be directly visible, the weapon must be present. The First Circuit has interpreted this definition to mean a general display of weaponry or a general threat, such as generally pointing or waving a weapon. *See United States v. Villar*, 586 F.3d 76, 89-90 (1st Cir. 2009); *United States v. LaFortune*, 192 F. 3d 157, 161 (1st Cir. 1999).

In contrast, per USSG § 1B1.1 Application Note 1(I), a dangerous weapon or firearm is "otherwise used" when the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon.   The First Circuit has interpreted this definition to mean an unmistakably clear and specific threat of harm, such as specifically leveling a cocked firearm or dangerous weapon at an individual or a group of

---

[4] The government submitted this objection to Probation but the PSR remained unchanged.

people.   *See Villar*, 586 F.3d at 89-90; *LaFortune*, 192 F. 3d at 161.    Thus, the distinction

between "brandishing" and "otherwise used" depends on the level of specificity to which the

weapon was used.   *See Villar*, 586 F.3d at 89-90; *LaFortune*, 192 F. 3d at 161.    Other circuits

have followed the First Circuit in this interpretation. See *United States v. Johnson*, 456 Fed.

Appx. 540 (6th Cir. 2012) (finding that a defendant who held a toy gun, directed people to get on

the ground, and told one victim he would "pop" him, had made a specific threat and thus

"otherwise used" a dangerous weapon); *United States v. Orr*, 312 F.3d 141, 144-45 (3rd Cir.

2002)(finding that a defendant who pointed a dismantled pellet gun at a bank employee and

ordered her to dump money into a garbage can made a specific threat and thus "otherwise used"

a dangerous weapon).

In *United States v. Albritton*, 622 F.3d 1104, 1106-07 (9th Cir. 2010), the Ninth Circuit

found that a defendant who pointed a BB gun directly a teller across the counter and yelled

"Down, Down!" had "otherwise used" the weapon.   The Court, relying on First Circuit

holdings, implicitly reasoned that directly pointing a weapon across the counter constituted an

unmistakably clear and specific threat.   *See Id.*   at 1106.

Here, the government argues the fake gun was likewise used by co-defendant Pantone to

make an unmistakably clear and specific threat rather than a general display of weaponry or

general threat.   *See Villar*, 586 F.3d at 89-90; *LaFortune*, 192 F.3d at 161.   Pantone remained in

front of the counter with the gun out throughout the entirety of the robbery and gave orders to

Dinovo.   The tellers saw the weapon and believed it was a real gun.   During that time, Dinovo

stole the money from the teller's drawer and from the vault.   Pantone told the tellers not to look

at them and repeated the command each time on of the teller's lifted his or her head.   Before

4

Dinovo and co-defendant Pantone fled the bank, one of the men told the tellers "[y]ou need to get down" and one employee started to kneel down.   Additionally, a color copy and a black and white copy of the same bank surveillance photo depicting Dinovo and Pantone is attached as Exhibit 1.[5]   Therefore, the government avers the facts of this case support this four level enhancement to the offense level calculation.

## III.        18 USC § 3553(a) FACTORS

### 1.  Nature of the Offense

The government argues that in calculating the sentence, the Court should consider the seriousness of the offense.   *See* 18 U.S.C. §3553(a)(requiring assessment of the nature and circumstances of a defendant's offense).   The offense of Armed Bank Robbery is significant in its seriousness.   The circumstances of this offense can be summarized as follows:   [t]he armed robbery occurred on Friday, October 9, 2015, at approximately 3:08 pm at the Hingham Institute for Savings Bank located at 80 Charles Street in Boston.   On that date, Dinovo and Pantone entered the bank with their faces partly covered, wearing hooded sweatshirts but portions of their faces were visible.   There were two bank employees working in the bank at that time.   After entering the bank, Dinovo vaulted the teller counter, while Pantone stayed in front of the counter in the lobby area near the entrance holding what appeared to be a handgun in the air which was seen by the bank employees.   Pantone remained in front of the teller counter with the gun out throughout the entirety of the robbery.   The tellers believed it was a real gun.   Dinovo jumped over the teller counter and demanded money from the bank employees.   Dinovo forced open a

---

[5] The black and white copy of the photo was previously provided to defense counsel and was also submitted to U.S. Probation as part of the government's statement of offense conduct.   Additionally, in its objections to the PSR, specifically, objection #2, the government requested that the bank surveillance photograph be included as part of the PSR and provided to the Court.

teller's cash drawer, grabbed money out of it then proceeded to the vault where he demanded one

bank employee open the vault.   After doing so, Dinovo removed money from the vault and

placed the money in a dark colored duffel bag.   *See* PSR ¶¶ 8-9.

During the robbery, Pantone repeatedly told Dinovo to "[h]urry up, let's go" and to "[g]et

the drawer."   At one point, Pantone told Dinovo, "[t]ime's up, we gotta go." Pantone appeared

to be keeping time throughout the robbery.   Pantone also told the tellers not to look at them and

repeated the command each time one of the teller's lifted his or her head.   *See* PSR ¶10.

After stealing the money from a teller's cash drawer and from the vault, Dinovo left the

teller area and he and Pantone left the bank together.   Before they fled, one robber said "I know

you pushed the alarm" while the other said "[y]ou need to get down."   An employee started to

kneel down.   Pantone and Dinovo then fled out of the bank on foot, with $16,320.95 in United

States currency, which they had stolen from the bank.[6]   *See* PSR ¶11.

A witness observed Dinovo and Pantone exit the bank and get into a Chevy Impala,

which remained parked and did not move.   A witness then saw both Dinovo and Pantone get out

of that car and both got into a cab.   A witness provided the medallion number of the cab to

police who located and stopped the cab approximately 30 minutes later near an intersection in

Charlestown.   Pantone and Dinovo were sitting in the back seat of the cab at the time.   Also

inside the cab, officers located a duffel bag containing $16,320.95, including bait bills that were

maintained by the bank at the time of the robbery, and an item that looked like a handgun, as

well as Dinovo's car keys.[7]   The cab driver informed police that the black back located in the

---

[6] The deposits of the Hingham Institute for Savings are insured by the Federal Deposit Insurance Corporation ("FDIC").
[7] All of the money has been recovered.

back seat of the cab was not his.   He stated it was the white males' and that one of the two men had the bag with him when the two men got into his cab.   *See* PSR ¶¶ 12-14.

Investigators assembled two separate live line-ups on the sidewalk.   One of the two tellers viewed the line-up containing Dinovo and identified him as the individual who jumped the counter and took the money from the bank.   The other bank teller viewed the line-up containing Pantone and identified him as the individual who held that item that appeared to be a handgun in the lobby area.   The FBI later determined the gun Pantone used during the robbery was an imitation gun, specifically, an airsoft fake gun.[8]   *See* PSR ¶¶16-17.

Over the course of nine days, Dinovo and Pantone robbed two Boston banks.[9]   Back on September 30, 2015, Dinovo and Pantone robbed a different Hingham Institute for Savings bank in Boston.[10]   In that case, both men wore hooded sweatshirts with the hoods up and cinched tightly around their places, and while Pantone stayed in front of the counter in the lobby area pointing an airsoft fake gun at the two tellers during the entirety of the robbery, Dinovo stole $26,919.00 from the teller drawers and the vault.[11]   *See* PSR ¶¶ 20-24.

As evidenced by Dinovo's actions in this case and by his prior criminal history, including prior convictions for a variety of offenses, as well as a prior uncharged bank robbery using a fake gun, this was not an aberrant isolated decision by Dinovo to commit this Armed Bank Robbery. His repeated conduct is both serious in its nature and in its impact on the community.   A significant period of incarceration is justified.

---

[8] Simulated weapons qualify as dangerous weapons under 18 U.S.C. § 2113(d).   *See United States v. Cannon*, 903 F.2d 849, 854 (1st Cir. 1990)(holding that evidence of toy gun can support an armed robbery conviction.)
[9] Each was charged only with the October 9, 2015, armed bank robbery.
[10] Neither was charged with that armed bank robbery.
[11] That money has not been recovered.

2.    **<u>The defendant's criminal history and characteristics</u>**

While the seriousness of the offense is a significant factor the government has considered in fashioning its recommendation, Dinovo's criminal history is of equal import.   Dinovo is currently 52 years old with a criminal record spanning more than 38 years, which is replete with a host of convictions.   The final PSR determined that Dinovo accumulated a total of 5 criminal history points resulting in a criminal history category of III.   *See* PSR at ¶¶ 70-71.   However, this computation does not tell the entire story.   Pursuant to U.S.S.G.§ 4A1.2(e)(3), many of Dinovo's criminal convictions are timed-out and thus, do not receive criminal history points. His criminal record also includes two prior federal convictions, one for being a felon in possession of a firearm and one for possession of PCP with intent to distribute.   *See* PSR at ¶¶ 61, 68.   In one federal case, he repeatedly violated his terms of supervised release.   *See* PSR at ¶ 68.

His criminal record dates back to 1980 when Dinovo was only 15 years old, and was charged with Attempt to Commit an Armed Robbery.   On 7/30/81, he was convicted of that charge and committed to the Department of Youth Services ("DYS").   *See* PSR at ¶ 43.   Also in 1980, he was charged in two other separate cases, namely, Larceny More, and Breaking and Entering of Motor Vehicle.   *See* PSR at ¶¶ 44-45.   On the first case, Dinovo initially received a one-year continuance without a finding until 11/6/81.   However, on 11/30/81, he received a DYS suspended sentence until 8/17/82 and on that date, the case was dismissed.   For the Breaking and Entering adjudication, Dinovo was initially given a one-year probationary term until 2/11/82.   However, on 7/30/81, he was revised and revoked and committed to DYS.   In January, 1981, he was charged with Attempted Larceny.   On 5/8/81, after a jury trial, he was

adjudicated delinquent and committed to DYS on that case.   *See* PSR at ¶ 46.   On 2/19/81, one

month after being charged with the above Attempted Larceny offense, Dinovo was charged in a

separate case with Armed Robbery and on 8/20/81, he was committed to DYS. *See* PSR at ¶ 47.

On three separate occasions in 1981, at the age of 15, and thereafter, on two separate occasions

in 1982, at the age of 16, Dinovo was charged as a juvenile in five separate cases.   In each, he

was committed to DYS.   Those adjudications included Larceny of Motor Vehicle, Assault and

Battery with Dangerous Weapon, Assault and Battery; Larceny More; Breaking and Entering

Daytime with Intent to Commit Felony, Larceny More; Use Without Authority; and Larceny and

Possession of Burglarious Tools.   *See* PSR at ¶¶ 48-52.   Pursuant to U.S.S.G. §4A1.2(d),

Dinovo receives no criminal history points for any of the above juvenile adjudications.

Nonetheless, they demonstrate both the length of criminal involvement by Dinovo and the

seriousness of the charges brought against him as a juvenile.   The Court can consider this

information pursuant to 18 U.S.C. §3553(a).

      Turning to his adult criminal record, Dinovo's adult convictions span from 1983 to 2015.

Dinovo has a significant number of adult convictions for crimes of violence, including, Robbery,

Assault with Dangerous Weapon, Assault with a Dangerous Weapon (3 counts), Possession with

Intent to Distribute PCP.   Additionally, he has been convicted for other crimes including

Knowing Receipt of Stolen Property (2 counts), Attempted Larceny of Motor Vehicle, Malicious

Destruction of Property (2 counts), Breaking and Entering Nighttime (4 counts), Knowing

Receipt Stolen Motor Vehicle, Possession of Burglarious Tools (5 counts), Malicious

Destruction of Property, Showing Another's License with Intent to Conceal, Possession of Class

B (cocaine), Larceny of Motor Vehicle, and Failure to Stop for Police Officer (3 counts).   *See*

PSR at ¶¶ 53-69.   His longest period of incarceration was back in 1994, when he received a 235 month committed sentence out of this district for being a Felon in Possession of a Firearm.   In 2011, he was released from prison in that case and on 9/29/14, his supervised release period was terminated.   *See* PSR at ¶ 61.

Prior to the instant case, Dinovo's most recent convictions occurred in 2015 when he was convicted of Assault and Battery on a Family/Household Member and Resisting Arrest.   On 8/17/15, he received a 3 month committed sentence on those offenses.   *See* PSR at ¶ 69.   Prior to that, he was found in violation of the terms of his supervised release three separate times between 2012 and 2013, on a 1993 federal drug conviction out of this District.   Relative to that 1993 drug conviction, back on 7/12/94, Dinovo received a 37 month committed sentence followed by 4 years of supervised release.   However, the case was still open in 2012 and on 6/6/12, Dinovo was found in violation of supervised release, and received a time-served sentence of 6 days, followed by a 3-year period of supervised release.   Thereafter, on 9/24/13, Dinovo was again found in violation of the terms of his supervised release, and received a time served sentence of 8 days, followed by 2 years of supervised release.   On 8/25/15, he was found in violation of supervised release for the third time in that case and received a 14-day committed sentence (after his release from state custody).   *See* PSR at ¶ 68.   Dinovo has demonstrated a repeated penchant for and a decades-long crime spree of committing serious and violent offenses.

Additionally, three different restraining orders have been issued against Dinovo involving two different women.   In August, 2014, one woman obtained a restraining order against the defendant which expired in October, 2014.   Thereafter, on 6/10/15, that same women obtained

another restraining order against the defendant and that order expired on 6/9/16.   The affidavit filed by the woman in support of the 2015 restraining order indicates Dinovo grabbed her as she was walking into the apartment with the dog, that he was screaming and yelling at her to leave the apartment, tried to push her out of the apartment, and ripped her sweatshirt off and pulled her hair.   *See* PSR at ¶¶ 104-105.   In connection with that incident, Dinovo was later convicted of Assault and Battery on a Family/Household Member.   *See* PSR at ¶69.   Separate from the above two restraining orders, on 5/1/12, the defendant's cousin secured a restraining order against the defendant and, on 5/15/12, that order was extended for one year.   However, on 10/24/12, at the request of the plaintiff, the order was terminated.   In the affidavit filed in support of that restraining order, the plaintiff indicated that during a disagreement with the defendant on 4/30/12, he punched holes in a door and prevented her from leaving her house. She advised that when she was able to leave, he followed her in his car, was driving erratically, and pulled out in front of her before stopping his vehicle.   She also indicated that on 4/12/12, when she attempted to leave her house, Dinovo jumped on the hood of her car and tried to smash her windshield.   She advised that during the three months before she obtained the restraining order, there had been "many occasions" during which Dinovo became "violent and threatening" and punched walls.   He also threatened her at work.   U.S. Probation and Pretrial Services records reveal the woman told Dinovo's supervising probation officer that she secured the restraining order because she had become very concerned about the defendant's behavior.   She also indicated that the defendant spied on her, had been stalking her, and on a few occasions, restrained her and tried to keep her from leaving he residence.   *See* PSR at ¶¶ 106-108.

3.     **Specific and General Deterrence**

The Court should also consider specific and general deterrence in this case.   *See* 18 U.S.C. § 3553(a)(2)(B),(C) (the district court may impose a sentence "to afford adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant**).** Here, Dinovo has been involved with the state judicial system for more than 37 years.   He has also violated his terms and conditions of supervised release.   In August, 2016, the defendant received a 14 day committed sentence for violating his conditions of supervised release on his 1993 federal drug conviction.   On 8/17/15, he received a 3 months house of correction committed sentence (deemed served) on an unrelated 2015 state case of Assault and Battery on Family/Household Member and Resisting Arrest.   *See* PSR at ¶¶ 68, 69.   Less than two months later, Dinovo committed the armed bank robbery in the instant case.   Clearly, specific deterrence is a factor to be considered in this case.

The government asserts that its recommended sentence of 57 months is an appropriate significant sentence which will communicate to Dinovo that he must stop committing crimes. General deterrence is an equally important consideration as well.   Such a sentence will send a message to similarly situated individuals who have committed a litany of serious crimes, that if they continue their criminal conduct and are convicted in federal court, they too will face stiff sentences.

IV.   **CONDITIONS OF SUPERVISED RELEASE**

The government recommends the maximum term of five-years of supervised release. This will allow Probation to closely monitor Dinovo for a lengthy period of time after he completes his committed sentence to assist with his re-integration into society and will hopefully

increase the likelihood that Dinovo will not re-offend.   Further, the government asks the Court to consider as special conditions of Dinovo's supervised release mental health treatment, substance abuse treatment, and for Dinovo to seek and maintain employment throughout the pendency of his supervised release.   *See* PSR at ¶¶ 119-140.   The government argues this is appropriate.   As outlined in the PSR, the defendant was terminated from the CARE program in September 2013, when he was detained on a violation of supervised release.   *See* PSR at ¶ 138. By his own statements to Probation, Dinovo spent approximately a decade in solitary confinement as a result of fights with guards and other prisoners and he has fractured his hands twice a result of punching things.   *See* PSR at ¶ 120.   Per the defendant, he has used drugs to help him cope with a variety of issues.   *See* PSR at ¶ 134.   Additionally, Dinovo has completed the Bureau of Prisons 40-hour drug treatment program.   *See* PSR at ¶ 135.   Per the PSR, it appears Dinovo is an appropriate candidate for the Bureau of Prison's ("BOP") 500-hour Residential Drug Abuse Program (RDAP) although it indicates final determination of qualification for that program is made by BOP.   Additionally, Dinovo has expressed an interest in participation in that BOP's program.   *See* PSR at ¶ 140.

## V.    <u>CONCLUSION</u>

In light of the foregoing, the government recommends the imposition of 57 months incarceration, followed by five years of supervised release with the special conditions of supervised release recommended herein, a $100 special assessment, and forfeiture.   The government argues that the proposed sentence properly takes into account and balances the various § 3553 factors, as discussed above and that it is a sufficient, but not greater than

necessary, sentence that complies with the dictates of that provision.   This sentence is an appropriate one that the government urges this Court to adopt.

                                        Respectfully submitted,

                                        ANDREW E. LELLING
                                        UNITED STATES ATTORNEY

                        By:     /s/ Suzanne Sullivan Jacobus
                                   Suzanne Sullivan Jacobus
                                   Assistant U.S. Attorney

Dated:   March 29, 2018

## CERTIFICATE OF SERVICE

        I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                   /s/ Suzanne Sullivan Jacobus
                                   Suzanne Sullivan Jacobus
                                   Assistant U.S. Attorney

14