UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
------------------------------------------------------------------------X
UNITED STATES OF AMERICA,

               -v-
                                                      15cr10326 (RGS)

RUSSELL DINOVO,

                        Defendants.
------------------------------------------------------------------------X

## DEFENDANT'S SENTENCING MEMORANDUM

COMES NOW the Defendant, Russell Dinovo, through his appointed counsel Inga L. Parsons, and hereby respectfully submits his Sentencing Submission in support of a guidelines sentence of no more than 57 months (the government's recommendation) as follows:

## SENTENCING LAW

This Court is obviously well aware of the federal law applicable to sentencing. The defense would just highlight some of the most important general guiding principles as 18 U.S.C. § 3553(a) requires sentencing courts to "impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in paragraph 2." This is known as the "parsimony" principle and is an "overarching instruction" of application of 18 U.S.C. § 3553 as described by the United States Supreme Court in *Kimbrough v. United States,* 128 S.Ct. 558, 563 (2007); *see also, United States v. Rodriguez*, 527 F.3d 221, 223 (1st Cir. 2008) (noting that the § 3553(b) factors are more than a laundry list of matters to be considered but comprise a "tapestry of factors, through which runs an overarching principle," the court's duty "to construct a sentence that is minimally sufficient to achieve the broad goals of sentencing.")

Section 3553(a)(2) states that such purposes are:

    A.    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    B.    to afford adequate deterrence to criminal conduct;

    C.    to protect the public from further crimes of the defendant; and

    D.    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

§ 3553(a) further directs sentencing courts to consider the Federal Sentencing Guidelines in addition to such diverse and individualized factors as the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwanted sentencing disparities. 18 U.S.C. § 3553(a)(1)-(7). The following analysis is provided in support of a guideline sentence.

The government's recommendation of 57 months which is within the guidelines is a reasonable sentence and Mr. Dinovo has no problem agreeing to such a sentence, however, counsel asks this Court to review the 3553(a) factors discussed below and consider sentencing Mr. Dinovo at the low end of the guidelines, as a sentence that is sufficient but not more than necessary to achieve the purposes of sentencing particularly given Mr. Dinovo's age, addiction and medical issues.

## BACKGROUND

**[(1)(a)(1) History and Characteristics of the Defendant]**

Mr. Dinovo is a smart, funny and warm man. He accepted full responsibility for his involvement at the outset but the plea was delayed due to legal issues. All the delays in this case were due to fair and reasonable legal challenges to his prior record and to determine the impact

of a toy gun on the offense.  Throughout, it was made clear to the government from the beginning that he had every intention of pleading guilty and there was no need to prepare for trial.

Mr. Dinovo was raised by his mother and has had essentially no relationship with his father.  One half-brother suffered a stroke and his other half-brother was shot and killed in 1980.   PSR ¶ 96, 97.  As his mother confirmed in his prior PSI, Mr. Dinovo has tried to develop a relationship with his father and has been rejected.  PSR ¶ 99.  Thus, not only did Mr. Dinovo not have a strong male figure in his life, he has the added emotional damage of being rejected by his father. *Id.*  As his mother previously advised, the shock and trauma of his half-brother's death and the rejection by his father has taken a severe toll on Mr. Dinovo.  *Id.*  He has not seen his father in over 20 decades.  *Id.* Mr. Dinovo's mother passed away in 2013 from Chronic Obstructive Pulmonary Disorder in 2013.

Statistics reveal that fatherless children are four times more likely to be poor. In 2011, 12 percent of children in married-couple families were living in poverty, compared to 44 percent of children in mother-only families. *See U.S. Census Bureau, Children's Living Arrangements and Characteristics: March 2011, Table C8. Washington D.C.: 2011.*

Children living in female headed families with no spouse present had a poverty rate of 47.6 percent, over four times the rate in married-couple families. *See U.S. Department of Health and Human Services; ASEP Issue Brief: Information on Poverty and Income Statistics. September  12, 2012 http://aspe.hhs.gov/hsp/12/Poverty And IncomeEst/ib.shtml.*

A study of 1,977 children aged three and older living with a residential father or father figure found that children living with married biological parents had significantly fewer externalizing and internalizing behavioral problems than children living with at least one non-

biological parent. *See, Hofferth, S. L. (2006). Residential father family type and child well-being: investment versus selection. Demography, 43, 53-78.* Indeed, children of single-parent homes are more than twice as likely to commit suicide. *See, The Lancet, Jan. 25, 2003 • Gunilla Ringbäck Weitoft, MD, Centre for Epidemiology, the National Board of Health and Welfare, Stockholm, Sweden, et. al. http://www.webmd.com/baby/news/20030123/ absent-parent- doubles- child-suicide-risk.*

Children in grades 7-12 who have lived with at least one biological parent, youth that experienced divorce, separation, or nonunion birth reported lower grade point averages than those who have always lived with both biological parents. *See Tillman, K. H. (2007). Family structure pathways and academic disadvantage among adolescents in stepfamilies. Journal of Marriage and Family.* Similarly, children living with their married biological father tested at a significantly higher level than those living with a non-biological father. *See id.* Studies show that father involvement in schools is associated with the higher likelihood of a student getting high grades. This was true for fathers in biological parent families, for stepfathers, and for fathers heading single-parent families. *See, Nord, Christine Winquist, and Jerry West. Fathers' and Mothers' Involvement in Their Children's Schools by Family Type and Resident Status. (NCES 2001-032). Washington, D.C.: U.S. Department of Education, National Center for Education Statistics, 2001.*

No surprise, adolescents living in intact families are less likely to engage in delinquency than their peers living in non-intact families. Compared to peers in intact families, adolescents in single-parent families and stepfamilies were more likely to engage in delinquency. *See Stephen Demuth and Susan L. Brown, "Family Structure, Family Processes, and Adolescent Delinquency: The Significance of Parental Absence Versus*

*Parental Gender," Journal of Research in Crime and Delinquency 41, No. 1 (February 2004): 58-81.*http://familyfacts.org/briefs/26/marriage-and-family-as-deterrents-from-delinquency-violence-and-crime.

While § 5H1.6 provides that family circumstances are not 'ordinarily relevant' in determining whether a departure is warranted, a sentencing court is required to consider 'the history and characteristics of the defendant' 'in determining the particular sentence to be imposed.'" *See* 18 U.S.C. §3553(a)(1); *see also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); *Witte v. United States,* 515 U.S. 389, 398, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995) ( "Thus, [a]s a general proposition, a sentencing judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.") (citation and quotation marks omitted) (alteration in original) (cited in *United States v. Thavaraja*,740 F.3d 253, 262 (2d Cir. 2014)). The Circuit went on to explain that in the post-*Booker* advisory Guidelines regime, "the Guidelines limitations on the use of factors to permit departures are no more binding on sentencing judges than the calculated Guidelines ranges themselves." *Thavaraja,*740 F.3d at 262 (citing *United States v. Jones,* 460 F.3d 191, 194 (2d Cir.2006) (citing, *inter alia,* § 5H1.6)).

This information is not to excuse Mr. Dinovo's behavior but to place his behavior in context. This is obviously not Mr. Dinovo's first offense. But the driving force behind much of Mr. Dinovo's behavior has been addiction and anger which he has been working on in prison and has made significant strides.

Alcohol and drugs are implicated in an estimated 80% of offenses leading to incarceration in the United States such as domestic violence, driving while intoxicated, property offenses, drug offenses, and public-order offenses. The National Council on Alcoholism and Drug Dependence, Inc. observed that most inmates are in prison, in large part, because of substance abuse:

- 80% of offenders abuse drugs or alcohol.
- Nearly 50% of jail and prison inmates are clinically addicted.
- Approximately 60% of individuals arrested for most types of crimes test positive for illegal drugs at arrest.

*See* https://www.ncadd.org/about-addiction/alcohol-drugs-and-crime.

Statistic show that of the 1.5 million inmates who met substance abuse disorders, only 11.2 percent have received any type of professional treatment since admission. Only 16.6 percent of facilities offer specialized treatment which can produce better outcomes for offenders. The National Center on Addiction and Substance Abuse at Columbia University: Behind Bars II: Substance Abuse and Americas Prison Population February 2010 https://www.centeronaddiction.org/addiction-research/reports/behind-bars-ii-substance-abuse-and-america%E2%80%99s-prison-population

Mr. Dinovo also struggles with his torn left foot and lower back due to a serious construction accident in 2015. It has become increasingly painful and he requires medication and treatment which he hopes to receive in prison and seeks designation to a medical facility. The problem is that federal prison authorities are struggling to provide adequate medical care to thousands of inmates because of persistent staffing shortages that have left some institutions with vacancy rates of 40% or higher, according to a Justice Department review. Johnson, "Feds struggle to provide prison medical care" USA Today , March 28, 2016.

https://www.usatoday.com/story/news/politics/2016/03/28/bureau-of-prisons-justice-department-review/82337734/

The aging inmate population has exacerbated the staffing gaps in recent years, as the government has been increasingly unable to compete with the private sector for medical professionals who are paid exponentially more outside of government, according to the report by Justice Department's inspector general. *Id.* Mr. Dinovo is likely to become one of those statistics and it is important for Mr. Dinovo's rehabilitation to receive the necessary medical and substance abuse treatment in prison and during his supervised release. Thus, Mr. Dinovo seeks a medical facility designation and to the extent he will be unable to receive adequate treatment, the sooner Mr. Dinovo can be released and subject to supervised release oversight and programs he can be assured of keeping up with his treatment and therapy.

**THE OFFENSE**

**[1(a)(1) Nature and Circumstances of the Offense]**

**[(2)(A) The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect For the Law, Provide Just Punishment]**

Mr. Dinovo's crime is a serious one and by asking the Court to sentence him to a sentence of not more than 57 months and counsel's request to consider the low end of the guidelines is not to suggest that his crime is not serious. Mr. Dinovo did not carry the toy gun but made sure that it was a toy gun so that no one would get hurt. PSR ¶ 19. He made clear at the outset that he "never meant to hurt anyone." PSR ¶128. The Probation officer in this case applied the factors that the Guidelines have determined as the proper range for this crime and the sentence requested by both parties is within that range.

## DETERRENCE AND RECIDIVISM

**[(2)(B) to Afford Adequate Deterrence; 2)(C) To Protect the Public From Further Crimes By the Defendant]**

Studies have shown that lengthier sentences do not deter recidivism. *See,* Michael Tonry, *Purposes and Functions of* Sentencing, 34 Crime and Justice: A review of Research 28-29 (2006) ("increases in severity of punishments do not yield significant (if any) marginal deterrent effects . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."). The Guidelines' offense level is not intended or designed to predict recidivism." *See* USSC, Measuring Recidivism at http://www.ussc.gov/publicat/Recidivism General.pdf.

Mr. Dinovo is 52. "Recidivism rates decline consistently as age increases." *See* U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 12, http://ww w.ussc.gov/publicat/Recidivism/ General.pdf. "Generally, the younger the offender, the more likely the offender recidivates." *Id*. Recidivism declines precipitously after 50 years of age. As the Commission has determined: "[a]mong all offenders under age 21, the recidivism rate is 35.5%, while offenders over age 50 have a recidivism rate of 9.5%." *Id*. Such statistics have been acknowledged by federal courts. In *United States v. Nellum*, 205 WL 300073 (D. Ind. 2005), for example, the district court observed that: The positive correlation between age and recidivism is impossible to deny. …One can only reasonably assume that the trend of decreasing recidivism continues downward after the age of 50. Under the guidelines, the age of the offender is not ordinarily relevant in determining the sentence. *See* § 5H1.1. But under § 3553(a)(2)(C), age of the offender is plainly relevant to the issue of

"protect[ing] the public from further crimes of the defendant." *Id*. at *3 (sentencing defendant to 108 months, 60 months less than the 168 minimum guideline range). The United States Sentencing Commission also recently acknowledged that it is the younger offenders whom judges tend to sentence to prison and that older offenders are more often sentenced to the alternatives sentences. *See Alternative Sentencing* at 12. Mr. Dinovo's age and where he is now in life can help provide confidence to the Court that he has finally commitment to a crime free life.

## GUIDELINES

**[(3) The Kinds of Sentences and (4) the Applicable Sentencing Range Under the Guidelines, and (5) Any Pertinent Policy Statements]**

Mr. Dinovo agrees with Probation's calculation of the Guideline range, which includes a three-point enhancement for "brandish[ing]" the fake gun. This results in a GSR of 51 to 63 months. The government, however, argues that Mr. Dinovo "otherwise used" the item, justifying a four-point enhancement, and thus resulting in a range of 57-63 months. The Probation Department has rejected this enhancement and for good reasons. Mr. Dinovo himself did not brandish the fake gun it was his co-defendant. But the co-defendant did brandish the firearm and it was added to Mr. Dinovo's sentence properly. However, the co-defendant did not receive an enhancement for "otherwise used" and not only would it affront the guidelines it would result it unwarranted disparity, particularly where it was not Mr. Dinovo who actually handled the firearm.

Under 18 U.S.C. § 924(a)(4) the congressional legislature provides a helpful definition, in that for that the term "brandish" means, with respect to a firearm, to display all or part of the

9

firearm, or otherwise make the presence of the firearm known to another person, **in order to intimidate that person,** regardless of whether the firearm is directly visible to that person. Similarly, the Guidelines define the term as follows: "[b]randished…means that the weapon was pointed or waved about, or displayed in a threatening manner." U.S.S.G. § 1B1.1, comment. (n.1(c)) (emphasis added). They further explain that "'[o]therwise used' means that the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing…" U.S.S.G. § 1B1.1, comment. (n.1(g)); *United States v. LaFortune*, 192 F.3d 157, 160 (1st Cir. 1999).

The First Circuit has grappled with drawing the line between the two, describing brandishing as "[a] general, or even pompous, showing of weapons, involving what one would consider an arrogant demonstration of their presence, [which] constitutes the generalized warning that these weapons may be, in the future, used and not merely [shown]." *United States v. Villar*, 586 F.3d 76, 89 (1st Cir. 2009). Likewise, it has described "otherwise used" as "specifically leveling" the weapon at someone with an express or implied threat. *Id.; LaFortune*, 192 F.3d at 160–61 (pointing the gun at tellers counts as "otherwise used"); *see also United States v. Moerman*, 233 F.3d 379, 380–81 (6th Cir. 2000) ("pointing the firearm in a threatening manner" without the use of verbal threats was "brandish[ing]" of a weapon); *United States v. Dunigan*, 555 F.3d 501, 505 (5th Cir. 2009) ( "otherwise used" requires that "[t]he threat to the victim must be specific rather than general"); *Villar*, 586 F.3d at 90 (The robber "otherwise used" the weapon when he pointed it at a teller, and ordered her to get up from her desk and move to the center of the bank); *United States v. Wooden*, 169 F.3d 674, 676 (11th Cir. 1999) (pointing a handgun at the victim's head one-half inch away constituted "otherwise used").

In this case the co-defendant held the fake gun in the air and stated "get

10

down." At no time did Mr. Dinovo or his co-defendant point the object at anyone in the course of the robbery or make any specific threats. The co-defendant's conduct amounts to "brandish[ing]", not "otherwise us[ing]" the item.

The most analogous case is *United States v. Sanchez,* 603 F. App'x 259, 263–64 (5th Cir. 2015), which involved the robbery of a jewelry store. In *Sanchez,* the defendant was holding a metal bar which he used to smash a display case, while the co-defendant instructed the employees to "get on the ground." *Id.* The Court held that this conduct amounted to mere brandishing: "a defendant makes a specific threat sufficient to constitute 'otherwise us[ing]' a dangerous weapon when he points or swings the weapon at an individual…," which Sanchez had not done. The Court noted that, although his display of the weapon and its use to break the jewelry case was "intimidating," the "link between the [weapon] and the verbal threat to get on the ground was too attenuated and general to warrant the enhancement." *Id.* at 264. Likewise, in this case, the co-defendant held the fake gun in the air, while at times instructing unidentified tellers to get on the ground. This conduct amounts to mere brandishing because he did not specifically level the item at anyone and did not make any specific threats, either explicitly or implicitly. Therefore, Probation correctly applied the three-point enhancement and the additional point was rejected in the co-defendant's case.

Although a guidelines sentence is not presumptively reasonable, challenges to such sentences as substantively reasonably is "particularly unpromising". *See United States v. Cox,* 851 F.3d 123, 126 (1st Cir. 2017). As set forth in the introduction to the guidelines, "the guidelines are the product of a deliberate process that seeks to embody the purposes of sentencing set forth in the Sentencing Reform Act, and as such they continue to play an important role in the sentencing court's determination of an appropriate sentence in a particular

case. *USSG* Ch. 1 Pt. A at p. 14 (2016).

The government's recommended sentence of 57 months is within the guidelines range for both levels. This sentence is not unreasonable and Mr. Dinovo is fully prepared to accept that as his sentence, but counsel believes that it is more than necessary to achieve the purposes of sentencing as discussed above and asks this Court to consider the bottom of the guidelines range, but, in any event, to impose a sentence of no more than 57 months.

## AVOID UNWARRANTED DISPARITY

### [(6) The Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Engaged in Similar Conduct]

Mr. Dinovo's co-defendant, Anthony Pantone, had an offense level of 22 and a criminal history of VI. His guidelines range was 84 to 105 months. He received a guideline variance sentence of 74 months based on his age, addiction and family responsibilities. In other words, the judge went below his calculated guidelines for the same offense by 10 months.

In this case, Mr. Dinovo is not seeking a variance from the guidelines and is fully prepared to accept the government's recommendation of 57 months. Counsel submits that the Court should consider whether bottom of the guidelines will appropriately account for Mr. Dinovo's severe addiction, his age, and the requirement that the lowest sentence be imposed under the 3553(a) factors, but does believe that a sentence of 57 months is not unreasonable.

## VOCATIONAL AND TREATMENT CONCERNS

### [(2)(D) To Provide the Defendant with Needed Educational or Vocational Training, Medical Care or Other Correctional Treatment in the Most Effective Manner]

Scientific research since the mid-1970s shows that treatment can help many in the criminal justice system who use drugs change their attitudes, beliefs, and behaviors toward drug use; avoid relapse; and successfully remove themselves from a life of substance use and crime. Additionally, one study found that overdose deaths following incarceration were lower when someone received medications for addiction while incarcerated. Green TC, Clarke J, Brinkley-Rubinstein L, et al. Postincarceration Fatal Overdoses After Implementing Medications for Addiction Treatment in a Statewide Correctional System. *JAMA Psychiatry*. February 2018. doi:10.1001/jamapsychiatry.2017.4614. Mr. Dinovo asks to be recommended for the RDAP program and for continued mental health treatment. Mr. Dinovo has been seeking continual therapy and mental health medications while in Wyatt which has been helpful and bodes well for future commitment to his mental health. *See* PSR at ¶ 126.

Mr. Dinovo has a number of skills and is a hard worker when he is not using. He has had a number of well paying jobs and to the extent he is able to do so with his current physical issues, he intends to do what it takes to obtain and maintain employment.

Mr. Dinovo is not lazy and he has not been idle in prison and has sought educational and vocational skills. As set forth in the PSR, Mr. Dinovo has worked and contributed to the Wyatt community during his current confinement. PSR ¶ 151. He has held employment throughout his incarceration working as an orderly, in the recreation department, laundry department and a facility shop and has received good work reviews. *Id.*

Mr. Dinovo received a letter from the Warden while at Wyatt where he helped prepare his unit for an audit. As described by the Warden, "through your efforts, the facility received an excellent review in the areas of cleanliness and sanitation by the auditors. The auditors specifically acknowledged your efforts." The Warden acknowledged the "hard work,

commitment to [his] assignment and pride [he] took in [his] work was truly evident." A copy of the letter is attached as Exhibit A. Mr. Dinovo has not had institution disciplinary issues since 2006. PSR at ¶ 68. Indeed, Mr. Dinovo has been a good prisoner which speaks volumes as to his ability to conform his behavior and abide by laws and rules which was not always the case as described by in the PSR. *See id*.

## CONCLUSION

At this stage in his life, Mr. Dinovo's commitment to sobriety and lawful gainful employment and a crime free future is strong and sincere. With age comes wisdom and Mr. Dinovo has spent a lot of his time reckoning his past and analyzing his future. He asks this Court to impose a guidelines sentence of no more than 57 months; and counsel urges the Court to consider the bottom of the range. The defense also requests that due to Mr. Dinovo's financial situation that a fine not be imposed. We further request that the Court recommend the RDAP program and a designated medical facility such as Devens or Butner, to ensure substance abuse and necessary medical treatment.

Respectfully submitted,

By his attorney,

/s/ *Inga L. Parsons*
_____
Inga L. Parsons (BBO#675211)
3 Bessom Street, No. 234
Marblehead, MA 01945
781-581-2262

## CERTIFICATE OF SERVICE

   I hereby certify that the foregoing was served on the 12th day of May, 2018 upon the all counsel or record by ECF/CM delivery:

      /s/ *Inga L. Parsons*
      Inga L. Parsons